[Civ. No. 10348.   First Appellate District, Division One.—October 28, 1937.]

JOHN E. BREZNIKAR et al., Respondents, v. T. J. TOPPER COMPANY (a Corporation) et al., Appellants.

Erwin C. Easton and George M. Mason for Appellants.

Jesse E. Nichols and Clarence E. Todd for Respondents.

KNIGHT, J.—A jury awarded damages in the sum of $15,000 against the defendants T. J. Topper Company, a corporation, and T. J. Topper, in an action growing out of the sale by the Topper Company to plaintiffs of a business in Oakland, it being alleged by plaintiffs in substance that about nine months subsequent to the sale said defendants committed certain malicious acts against plaintiffs, including the commencement of two unfounded lawsuits, the purpose and effect of which was to destroy the goodwill of said business and ruin the business standing and credit of plaintiffs. Judgment was entered in accordance with the jury's verdict, and following the denial of defendants' motion for new trial, defendants appealed from the judgment. The principal grounds urged for reversal are insufficiency of evidence, errors of the trial court in ruling on the admissibility ·of evidence, and excessive damages.

The evidence is conflicting on some points, but in the main the following are the transactions which led up to the commencement of the present action: The Topper Company had been in existence many years. It was organized by T. J. Topper, and he was its president and controlled its operations. The company was engaged in the business of selling restaurant equipment and supplies, in carrying on which it operated two stores, the principal one being in San Francisco and the other in Oakland. The respondent Breznikar had been employed as the manager of the Oakland establishment for about four years preceding November 9, 1931; and on that date said company, acting through Topper, sold the Oakland establishment to Breznikar and the respondent Corbett for $8,000, under a conditional sales contract upon which respondents made a down payment of $2,000 in cash, and they agreed to·pay the balance of $6,000 in monthly instalments of $100 each. Respondents were permitted to continue the business under the name of the Topper Company, and Topper kept in close touch with its operation and advised respondents concerning its management. From time to time following the sale respondents purchased quantities of merchandise on credit from the Topper Company, and in March, 1933, they owed said company therefor on an open book account approximately $6,000, the payment of which

appellants were demanding; whereupon a written agreement was entered into between the parties pursuant to the provisions of which respondents gave to said company their promissory note for $6,000, payable in monthly instalments of $100 each, until May 15, 1934, at which time the entire balance was to fall due. Conforming also to the terms of said agreement respondents delivered to appellants four outstanding sales contracts theretofore obtained by respondents from customers, so that as provided in said agreement appellants might refinance the same and apply the proceeds as payments on said note. On December 21, 1933, appellants sent letters to several of respondents' debtors to the effect that appellants had instituted legal proceedings against respondents and advising said debtors to withhold all payments due respondents until the termination of the litigation or to transmit the same direct to appellants. As a matter of fact, at the time these letters were sent no legal proceedings had been instituted, but two days later and on December 23, 1933, the Topper Company did commence suit against respondents on the $6,000 promissory note and obtained a writ of attachment which it caused to be levied on respondents' bank account and also upon some thirteen outstanding accounts due respondents from their customers. Five days later and on December 28, 1933, said company, acting through Topper, commenced another action against respondents in claim and delivery to repossess the merchandise sold to respondents under the agreement of sale of November 9, 1931; and on the day the action was filed the sheriff, acting under the authority of the writ of replevin and pursuant to directions from Topper, took possession of the Oakland store. Thereupon respondents, according to their testimony, immediately phoned Topper to ascertain the meaning of the proceeding, and in response Topper appeared at the store, demanded the keys, and told respondents that they "were all through, to get out". Respondents complied with Topper's demands, and as soon as they left the premises the sheriff, acting under written instructions from Topper and his attorney, released the store and Topper took possession; whereupon he closed the store, placed a sign on the front door reading: "Closed for inventory. Open January 2, 1934. For information call Market 7561" (which was the San Francisco phone number of the Topper Company); and within a day or two thereafter

proceeded to remove by truck some of the merchandise from said store.

Claiming that they had not defaulted in the payments called for by the agreement of sale or the promissory note, respondents on January 9, 1934, filed suit against appellants wherein they asked for damages, injunctive relief, and the cancellation of the agreement of sale, and of the promissory note. The injunctive relief sought was that appellants be restrained from prosecuting the attachment and replevin lawsuits, and from annoying, harassing, and "persecuting" respondents. Meanwhile the owner of the premises attached the store for rent, and respondents' numerous other creditors began pressing them for money, so that as a consequence respondents were obliged to make a complete assignment of their business to the Oakland Credit Men's Association, for the benefit of their creditors. Thereupon the Topper Company, in order that it might participate in the liquidating dividends, dismissed the attachment and replevin suits against respondents; and respondents, under circumstances about which there is a dispute, delivered to said credit association a dismissal of their action for damages and injunctive relief against appellants. Thereafter the present action for damages was instituted.

The fourth amended complaint, upon which the case was tried, contained three causes of action, stated separately. The first was for the damages respondents claimed to have sustained by reason of the attachment suit, the mailing of said letters to respondents' customers, and the removal from the store by Topper of some of the merchandise. The second was for the damages they claimed to have suffered as the result of the replevin suit; and by the third (with which we are not concerned because it was dismissed by respondents during trial) recovery was sought against the sureties on the undertaking given in the attachment suit.

In the first cause of action it was alleged, among other things, that the writ of attachment was levied on the store. Admittedly, however, such was not the fact. It was seized under the authority of the writ of replevin, and in view of this situation appellants contend, first, under the heading that the evidence is legally insufficient to support the verdict, that respondents "submitted no proof . . . under the first cause of action". As above stated, however, the demand for

damages under the first cause of action was not confined to the allegations concerning the attachment of the store. It included also damages accruing as the result of the attachment of respondents' bank account, the garnishment of some thirteen outstanding accounts due them, the writing of the letters to respondents' debtors prior to the commencement of any suit, and the alleged illegal removal from the store by Topper of part of the merchandise therein, all of which respondents claimed contributed to the loss of their business, stock in trade, good will and credit. It is evident, therefore, that if as respondents alleged and the jury found, the various additional acts thus complained of were malicious, respondents were entitled to reasonable damages resulting therefrom, regardless of the erroneous allegation as to the attachment of the store.

Appellants next contend that respondents having dismissed their first action were barred from bringing the present one; that such dismissal operated as a *retraxit* or a dismissal with prejudice. This contention is based upon the proposition that the dismissal was for a consideration, to wit, a release by the creditors, including appellants, of any claims against respondents. As pointed out in the case of *Lamb* v. *Herndon*, 97 Cal. App. 193 [275 Pac. 503], however, there is a marked distinction between a judgment of dismissal entered by a trial court pursuant to a stipulation entered into by the parties in open court, and a dismissal entered by the clerk pursuant to the written request therefor filed by the plaintiff under the authority granted by subdivision 1 of section 581 of the Code of Civil Procedure. In the former case it is held generally that the judgment of dismissal by the court operates as a bar to further litigation of the matters involved; whereas in the latter case, in the absence of exceptional circumstances showing to the contrary, the dismissal is deemed to be without prejudice. Here the dismissal was of the latter kind. Moreover, affirmative and positive testimony was given by respondents' attorney to the effect that prior to and at the time of the delivery of the written request for dismissal it was distinctly understood that such dismissal would be without prejudice. We are of the opinion, therefore, that under the circumstances stated it cannot be held as a matter of law that the dismissal operated as a *retraxit*.

■ The remaining points urged by appellants concerning the question of their liability for damages relate to the legal sufficiency of the evidence to support the claim of respondents and the conclusions reached by the jury and the trial court that there was a lack of probable cause for the institution of the attachment and claim and delivery actions, and that the commencement of the same and the commission of the other acts charged were prompted by a malicious motive. And the determination of the first issue depends upon the question of whether at the time of the commencement of said actions defendants were in default in the payments called for by the promissory note and the conditional sales contract.

The promissory note was dated March 14, 1933, and was in the usual form, providing for the payment of $6,000 in monthly instalments of at least $100 up to May 15, 1934, at which time the entire balance fell due. Therefore, on December 23, 1933, when the attachment proceeding was filed, the total amount of accrued principal on the note, according to its terms and provisions, was $900. But admittedly up to the time the action was filed appellants had credited respondents with payments on said note aggregating $3,415.16, and it was so affirmatively alleged in the complaint filed by appellants in the attachment suit. Appellants contend, however, that inasmuch as approximately $2,900 of said payments were made up of moneys raised from the refinancing of customers' contracts, and that less than $500 was paid by respondents, respondents were in default in their payments. Obviously, this contention cannot be sustained, because there is nothing in said note excluding the application of the proceeds derived from said contracts as payments on the note; and to the contrary, it was expressly provided in paragraph 3 of the agreement pursuant to which the note was given that ''Whatever moneys parties so raise (on said contracts) shall be immediately credited on said second parties' said note.'' Appellants call attention to the following provision in paragraph 2 of said agreement: ''That the said note is to represent and be the sole method by which the indebtedness of the second parties to the first parties shall be paid, except as hereinafter conditioned.'' But manifestly there is nothing in this provision which is inconsistent with the clear provision of paragraph 3; and moreover, up to the time

of filing the attachment proceeding appellants evidently found no inconsistency between the two provisions, because on the books of the appellant company respondents were given credit on the note for the amount of the proceeds received from the refinancing of said contracts.

With respect to the conditional sales contract, the evidence shows that respondents made the regular monthly payments called for therein from November 9, 1931, the date of the execution of the agreement, up to the time of the execution of the second agreement and the promissory note in March, 1933, and that thereafter, during the ensuing nine months and up to the time of the commencement of the replevin action in December, 1933, appellants collected more than the accrued sum of $900 due thereon from customers' contracts other than those mentioned in the March, 1933, agreement; and as shown by the books of the appellant company the collections so made were credited by appellants as payments on the conditional sales contract; hence nothing was due thereon at the time of the commencement of the replevin suit. ▉ At the trial, however, appellants objected to the testimony given on behalf of respondents as to the understanding had between the parties concerning the application of the proceeds received from said customers' contracts to the payment of the monthly instalments of said agreement upon the ground that said testimony tended to alter, vary and contradict the terms of the written agreement; and they now assign as error the trial court's ruling admitting such testimony and the giving of three instructions bearing upon the question of the application of such payments. We are of the opinion that the ruling of the trial court and the instructions complained of were proper. As suggested in effect by the trial court, there was nothing in the agreement limiting the source from which the monthly payments should be made, and the testimony showing that appellants subsequently agreed to and did in fact accept customers' contracts as payment thereof did not in any manner vary, alter or contradict the terms of the written agreement.

The evidence, although conflicting, shows also that just preceding the commencement of said lawsuits Topper held several conversations with respondents, insisting that the Oakland store be closed; that the stock be moved to the San Francisco store, and that respondents be employed there

at a fixed salary. It further shows that respondents refused to accede to his demands, and that eventually Topper told them that if they did not do ''as he wanted'' he would ''smash'' their business; that he would ''break'' them; and that immediately afterwards they were served with the papers in the replevin suit. In view of the foregoing we conclude that the evidence is legally sufficient to support the implied findings of the jury and the trial court, that there was a lack of probable cause for the commencement of said actions and that the activities of appellants in connection with the closing of the business were malicious.

However, we are convinced that, as appellants contend, the allowance of $15,000 damages was so grossly excessive as to show that the jury in fixing the amount was influenced by a feeling of prejudice and passion. The matter of punitive damages is not involved, compensatory damages alone being sought, the amount of which must, of course, be reasonable and not so disproportionate to the damage suffered as to be contrary to substantial justice. (Civ. Code, sec. 3359.) The evidence introduced on this issue is quite voluminous, involving a mass of calculations and accounts, and it would be quite impracticable to narrate the same in detail. Summarized, the essential facts appearing therefrom describe the situation to have been as follows: The total amount of money put into the business by respondents was in round figures less than $5,000, which consisted of the down payment of $2,000, sixteen monthly instalments of $100 a month, and about $1100 collected by appellants from respondents' customers and applied on the agreement of purchase. But during the twenty-five months respondents operated the business they drew therefrom approximately $5,000, at the rate of about $100 a month each; and after acquiring the business they continued to run steadily in debt. In other words, when they acquired the business in November, 1931, they owed but $6,000, which represented the balance due on the purchase price; whereas a little more than two years later, when they made the assignment to creditors, their total liabilities amounted to approximately $11,500, which included delinquent rent and an indebtedness of some $2,800 due numerous creditors other than appellants. True, respondents turned over assets consisting of stock in trade and accounts receivable, which they estimated to be of the

value of $13,000. But that such estimate was exorbitant is clearly demonstrated by the fact that although the creditors themselves liquidated the business, they received only forty cents on a dollar, or less than $4,700. Furthermore, the evidence shows that in the agreement of March, 1933, respondents agreed that thereafter they would pay appellants cash for all goods purchased from appellants, and that during the succeeding nine months they ran up an unpaid indebtedness therefor in the sum of $763; also that during those nine months two checks of $100 each given by them to appellants were refused payment by the bank on account of insufficient funds, and that at the time of the assignment they were delinquent in the payment of the rent for the store. It would seem, therefore, that in view of all of the foregoing facts the estimate of $2,000 fixed by respondents as the loss of the good will of the business was likewise exorbitant.

For the reasons stated the judgment is reversed and the cause remanded for retrial solely upon the issue of damages, with directions to render judgment in favor of respondents and against appellants for the amount of damages so found upon a determination of that issue, respondents to recover costs.

Tyler, P. J., and Cashin, J., concurred.